Gaston, J.
 

 The tract of land, which is the subject of the present controversy, is part of the territory, which formerly was held by the Cherokee Indians, and which was ceded to the United States by the treaty of New Echota, concluded on the 29th of December, 1835. The lessors of the plaintiffs claim to b'e entitled to this tract, under the provisions of the Sth article of the treaty made at the Cherokee agency on the 8th of July, 1817. Several questions pre--sented themselves upon the trial, of which the most important is, whether “the reservations” thereby made to the
 
 *68
 
 Reads of Indian families, residing on the East of the Mis- and wishing to become citizens of the United States, .attached to, and operated upon the lands which were ceded to United States by the treaty of 1835. His Honor was of opinion that these reservations .did not attach thereto, and .a v.erdict having been taken for the plaintiff, subject to that opinion, judgment of nonsuit was entered, and .the plaintiffs brought up the .case by appeal to this court.
 

 We have met with difficulties in interpreting several parts of this treaty of 1817, nor can we be confident, after all the .attention bestowed on it, that we fully comprehend every one of its provisions. In relation, however, to the precise .question involved in the decision made below, we have no hesitation in declaring our concurrence in th.e opinion there held.
 

 The treaty of 1817 begins by declaring, .that one portion the Cherokee nation, consisting of those who were known as t;he upper Cherokee towns, had made known to the President of the United ¡States their desire to engage in the pursuits of agriculture and civilized life in'the .country which they then occupied, and that, binding the other part of the nation not disposed to unite with them in these pursuits, they were solicitous to have a division line established between the upper and lower towns, and to contract their so-.ciet.y wi.thin the special limits, (including the waters .of the Hiwassee River,) to be assigned to them .exclusively. It further recites, that the other portion of the nation, known as the Lower Towns, had made known to the President, that they desired to continue the hunter-life, and, because of the scarcity of game where they lived, wished to remove across the Mississippi upon the vacant lands of the United States. It states that the President, in answer to these respective communications, had expressed his solicitude to gratify both parts of the nation, and had promised to provide for those, who should remove across the Mississippi, a tract of country well suited to their object, and to allot it to them in exchange for that portion of the country, which they might leave and in which country they held an undivided share in the pro
 
 *69
 
 portion which their numbers bore to the rest of the nation ; that, in consequence of these communications and this mise, a region oí country west of the Mississippi, on the Arkansas and White Rivers, had been selected for the emigrating portion of the Cherokees, and had been settled by a part of them, and these were anxious to conclude the proposed exchange and were ready to relinquish to the United States the interest or right, which belonged to them as a part of the Cherokee nation, to a proportionable part of the country which they had left or were about to leave. After this recital, the treaty declares, article the first, that the whole Chero-tee nation cedes to the United States all the lands lying north tnd east of certain boundaries therein described, “in part of the proportion of land in the Cherokee nation east of the Mississippi, to which those on the Arkansas and these about to remove there, are entitled.” By the second article, the Cherokee nationmake a further cession to the United States of the lands lying north and West of certain boundary lines therein described. In the third article, it is stipulated that a census be taken of the whole Cherokee nation in the month oí June, 1818, and particular provisions are made as to the mode of taking the census of those on the east side of the Mississippi, who declare their intention to remove, and “ the census of the Cherokees on the Arkansas River and those removing there, and who at that time declare their intention of removing there.” In the 4th article, the contracting parties stipulate that the annuity due from the United States to the whole Cherokee nation shall be divided between the two parties agreeably to their numbers, and shall be continued to be. divided, “ and the lands to be apportioned and surrendered to the United States agreeably to the aforesaid enumeration, as the proportionate part, agreeably to their numbers, to which those who have removed and who declare their intention to remove, have a just right, including these with the lands ceded in the first and second articles of the treaty.” By the 5th article, the United States bind themselves, in exchange for the lands ceded in the 1st and 2d articles, to give to that part of the Cherokee nation
 
 on the
 
 Arkansas River as much
 
 *70
 
 [and on that and the While river, as they have “ or hereafter may receive from the Cherokee nation east of the Mississippi, acre per acre, as the just proportion due that part of thena-t-ion on the Arkansas agreeably to their numbers.” In the 6tb, the United States, besides binding themselves to give to all the poor warriors, who may remove to the western side of the Mississippi, some arms and utensils, as a just compensation for the improvements they may leave, agree to pay to those emigrants, whose improvements add real value to their lands, a full valuation for the same, to be ascertained by a commissioner to be appointed by the President for that purpose, and to be paid as soon after the ratification of the treaty as possible. The seventh article declares, that, for all improvements which add real value to the lands lying within the boundaries ceded to the United States by the 1st and
 
 2d
 
 articles, the United States do agree to pay at the time and to be valued in the same manner as stipulated in the 6th article, or in lien thereof to give in exchange improvements equal in value to those the emigrants may leave and for which they are to receive pay. “ And it is further stipulated that all these improvements left by the emigrants within the bounds of the Cherokee nation east of the Mississippi, which add real value to the lands and for which the United States shall give a consideration and
 
 not so exchanged,
 
 (that is, as we understand the phrase, not ceded nor to be ceded by this treaty in exchange for lands on the Arkansas and White rivers,) shall be rented to the Indians by the agent, year after year, for the benefit of 'the poor and decrepit of that part of the nation east of the Mississippi, until surrendered by the nation or to the nation. And it is further agreed that the Cherokee nation shall not be called upon for any part of the consideration paid for said improvements at any future day.” Then follows the 8th article, on the correct construction of which depends the question presented for our decision. Its words are,
 
 “
 
 and to each and every head of any Indian family, residing on the east side of the Mississippi river, on the lands that are now or may hereafter be surrendered to the United States, who may wish to become citizens of the Uni
 
 *71
 
 ted States, the United States do agree to give a reservation of 640 acres of land in a square to include their improvements, which are to be as near the centre thereof as practicable, in which they will have a life estate with a reversion in fee-simple to their children, reserving to the widow her dower, the register of whose names is to be filed in the office of the Cherokee agent, which shall be kept open until the census is taken as stipulated in the 3d article of this treaty. Provided that if any of the heads of families, for whom reservations may be made, should remove therefrom, then in that case the right to revert to the United States. And provided further, that the land which may be reserved under this article be deducted from the amount which has been ceded under the first and second articles of this treaty.”
 

 On the 27th of February 1819, a convention was entered into at Washington between the United States and the Cherokee nation, whereby, after reciting that the greater part of the Cherokee nation wished to remain on the east side oí the Mississippi river, and, being desirous, without further delay or the trouble and expense of taking a census, finally to “adjust” the treaty of July, 1817, had offered to cede to the United States a tract of country at least as extensive as that to which the United States were entitled under its provisions, the Cherokee nation ceded to the United States all their lands lying north and east of a certain line therein described, i! in full satisfaction of all claims which the United States have on them, on account of a cession to apart of their nation, who have or may hereafter emigrate to the Arkansas;’ and it was further declared that this treaty was tobe a “final adjustment” of that of the 8th of July, 1817. By the second article of this convention, the United States agreed to pay, according to the stipulations of the treaty of July, 1S17, for all improvements on land lying within the country ceded by the Cherokees which added real value to the land, and to-allow a reservation of 640 acres to each head of any Indian family residing within the ceded territory, (.those enrolled for the Arkansas excepted) who chose to become citizens oí the United States in-the manner stipulated in the said treaty.
 

 
 *72
 
 None of these cessions covered the territory, in which is situate the land in dispute. But finally, by the treaty of new Echota of the 29th of December, 1835, as explained and amended by the supplementary articles of the first of March, 1836, the Cherokees’made a cession of all their lands on the east side of the Mississippi. The consideration of this cession was a large sum of money, five millions of dollars, paid by the United States, and in this treaty, not only reservations are omitted to be made, but in the preamble to the supplementary articles it is declared, that it is the determination of the President of the United States not to allow any reservations.
 

 Sutton’s wife,;» Ch'erokee by birth, and with him a lessor of the plaintiff, was at the date of the treaty of 1817, the mother of four children, and lived among the Cherokees of the upper towns on the unceded territory. In August, 1817, Sutton, in right of his wife, caused an entry to be made of the land now sued for as h'er reservation under that treaty. The Cherokees would not allow him to take possession thereof, but held the same as a part of their territory, until they surrendered all their country on this side of the Mississippi by the treaty of 1835.
 

 The very term “ reservation” seems to imply that the land reserved is taken out of the territory ceded, that is to say, is a portion excepted from the mass of the general cession, and kept back or otherwise diverted when that mass was surrendered. The reservations, also, are described in the treaty as in the nature of donations or grants from the United States ; “ the United States
 
 agree to give
 
 to each head of an Indian family;” and it would not only be a singular pretence of bounty but a most unusual species of grant, for the United States to make gifts,' by way of reservation, out of a territory, not only recognized as belonging to the Indians, but the enjoyment of which by the Indians it was an object of the treaty to secure, so that theymight more effectually prosecute thereon their plans of agricultural improvement and civilized life. The provisos annexed to the 8th article further shew that the reservations were not to take effect, until after the cessions made and except out of .the territory ceded. The
 
 *73
 
 first declares that upon the removal of any Indian family from the reservation allotted to them,- “ the fight,” must mean the right to the land comprehended within the reservation, “ shall revert to the United States.” Such a stipulation would be shamelessly unjust to the Indians, if the reservation were made out of territory, which they had never surrendered, and the phrase “revert” implies that the land coming back to the United States was such as had belonged to them, subject to the relinquished reservation. The second proviso stipulates, that, when the United States shall be about to ascertain the quantity of land, which they are to give on the Arkansas and White rivers, acre for acre, in exchange for the territory ceded by the Indians, the number of acres contained in the reservations is to be deducted from the amount ceded. This clearly indicates that the reservations are made out of the territory ceded.
 

 Nor shall we be led to a different construction of this article by a consideration of the terms in which the agreement on the part of the United States is expressed. “ The United States agree to give.” These are clearly words of promise, indicative of an engagement thereafter to be carried into execution. “To each and every head of an Indian family residing on the east side of the Mississippi River, on the lands that are now or may hereafter be surrendered to the United States, who may wish to become citizens of the United States-” The persons thus described are the objects of this promise, and they cannot be mistaken. They are such heads of Indian families as, residing on the ceded lands, either' the lands then ceded or thereafter to be ceded, may prefer, instead of accompanying their brethren to the Arkansas, to reside where they have theretofore resided, and, quitting their nation, to become citizens of the American Union. And to these the United States
 
 “
 
 agree to give a reservation of 640 acres of land in a square, to include their improvements.” The' reservations, then, are on the land which they have improved. Now, when is this promise to be fulfilled? Unquestionably as the occasions for carrying it into execution shall arise. To the Indians residing on
 
 *74
 
 the lands actually coded by the treaty of 1817, the United States were bound to furnish the means of immediately procuring their reservations. These might be regarded as hav-
 
 upon the execution of the
 
 treaty, and,
 
 upon the declaration of their purpose to become American
 
 citizens, a vested right to the promised reservations upon the territory ceded. But no such right could be pretended on the part of those, who might be residing on territory thereafter to be ceded. This part of the engagement rested solely in covenant. At any time before the fulfilment of that covenant could be demanded, it was competent for the contracting .parties to annul or modify, at their will, the agreement whereby it was constituted. If the engagement continued force and unchanged, until a subsequent surrender or cession was made, then, and not till then, it was incumbent on the United States to give the reservations promised to those residing in such surrendered territory.
 

 If we attend to the context of the treaty of 1817, and attend also to the provisions already referred to in the treaties of 1819 and 1835, we cannot fail to see ..that the views now taken were those of the contracting parties. We shall see also what were the lands which the treaty of 1817 speaks of • as “thereafter to be surrendered,” and we shall be satisfied that all which good faith requires has been done, on the part of the United States,'in regard' to these- lands and the residents thereon. It is a primary principle, and indeed the basis, of the Treaty of 1817, that the Cherokees should cede to the United States such a portion of the territory, then held by them, as was equivalent to the share, to which, in proportion to their numbers, the emigrating part of the nation was entitled, and that for the territory so ceded and to be ceded, the United States were to allot’ to this part of the nation an equal quantity of land, “-acre per acre,” on the Arkansas and White Rivers. In the preamble to the treaty, the President’s promise to the nation,, with respect to the . wish of one part of them to remove beyond' the Mississippi, is expressed in these words : “ When this party (the exploring party) shall have found a tract of country suiting the
 
 *75
 
 emigrants, and not claimed by other Indians, we will arrange with them and you the exchange of that for a just tion of the country they leave, and to a part of which, proportioned to their numbers, they have a right.”, And again, in the preamble, the emigrating part declare their desire
 
 “to
 
 execute a treaty, relinquishing to the United States all the right, title and interest to all lands of right to them belonging, as part of the Cherokee nation, which they have left, and which they are about to leave, proportioned to their numbers, including with those on the Arkansas, those who are about to remove thither, and to a portion of which they have an equal right, agreeably to their numbers.” The cession made by the Gherokees in the first article of the treaty, is expressed to be made
 
 “inpart
 
 of the proportion of land in the Cherokee nation, east of the Mississippi, to which those on the Arkansas, and those about to remove there, are justly -entitled.” A census was agreed to be taken of the whole Cherokee nation, in order, among other things, to ascertain, as is declared in the 4th article, what further lands were “ to be apportioned and surrendered to the United States, agree-. ably to the enumeration,” so as to make up with the lands ceded in the first and second articles, !! the proportionate part, agreeably to their numbers, to which those who have removed, and who declare their intention to remove, have a just right.” And, in the 5th article, the United States bind themselves to give to that portion of the Cherokee nation on the Arkansas, as much land on that and the White River as they have, or
 
 hereafter may
 
 receive, from the Cherokee nation, east of the Mississippi, acre for acre, as the just proportion due that part of the nation on the Arkansas, agreeably to their numbers.” It is manifest, that the lands spoken of as “ to be surrendered,” were such further lands as might be required to complete the full share of the-entire Cherokee country, to which, in proportion to their numbers, the emigrating Cherokees were entitled ; which
 
 share
 
 had been exchanged with the United States for lands on the Arkansas and White Rivers. Cherokee families residing on the lands actually ceded by the treaty, and on the lands which, in pursuance of the terms of that treaty, were to be afterwards
 
 *76
 
 surrendered, and quitting the nation in order to be ineorpo-into our Union as American Citizens, thereby ceasing to constitute a part of either portion
 
 of
 
 the Cherokees, were to *lave reservations of land assigned them; and the lands so reserved or .taken ou t of the ceded territory, were not to be estimated in fixing the equivalent of land to be given in exchange for the territory ceded.
 

 The treaties of 1819 and 1836, not only illustrate and confirm this view of the subject, but shew that the promises in the treaty of 1817, have been fulfilled. The former of these, announces its purpose to be to
 
 adjust
 
 finally the matters stipulated to be done, and remaining to be done, under the treaty of 1817, without the delay, trouble and expense, of a census, and.for that end to make a further cession of a tract .of country
 
 “
 
 at least as extensive as that to which the United States were entitled, under its provisions.” The tract thus ceded, is declared to be in full satisfaction .of all claims which the United States have, under the treaty of 1817; the treaty of 1819, is pronounced to be
 
 “a
 
 final adjustment of that of 1817 ; and the reservations allowed to heads of Indian families, desirous of becoming American citizens, are -in terms confined .to those residing on the ceded territory. By the treaty of 1819, all the promissory parts of the previous treaty w.ere executed. The additional territory promised to the United States was surrendered, and the reservations promised by the United States to be made, in
 
 relation. to
 
 such additional territory, were specifically provided for.'
 

 The treaty of 1835, as explained by the supplementary articles, is made on principles totally different from
 
 those on
 
 which were founded the treaties of 1817 and 181.9. It provides for a sale, out and out, of the remaining territory of the Cherokees, east of the Mississippi, for a stipulated price. It makes no reservations out of that territory for any Cherokee families, but, in the plainest terms, declares that the cession is of the entire territory, unincumbered by reservations, or promises of reservations.
 

 Without passing upon the other questions raised, we are
 
 *77
 
 decidedly of opinion that the judgment of the Superior Court ought to be affirmed with costs.
 

 Per Curiam. . Judgment affirmed.